## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL MEYER, MEARON OKONSKY, and ANDREA CAPANI Derivatively on Behalf of Nominal Defendant ASTRA SPACE INC. (F/K/A HOLICITY INC.), <br><br> Plaintiffs, <br><br> v. <br><br> CHRIS C. KEMP, ADAM LONDON, CRAIG O. MCCAW, SCOTT STANFORD, MICHAEL LEHMAN, MICHÈLE FLOURNOY, LISA NELSON, KELYN BRANNON, AND STEVEN EDNIE, <br><br> Defendants, <br><br> and, <br><br> ASTRA SPACE INC. (F/K/A HOLICITY INC.), <br><br> Nominal Defendant. | Case No.: <br><br><br> **JURY TRIAL DEMANDED** |

## <u>VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT</u>

Plaintiffs Daniel Meyer, Mearon Okonsky and Amdrea Capani ("Plaintiffs"), by and through their undersigned attorneys, bring this derivative complaint for the benefit of nominal defendant Astra Space, Inc. (f/k/a Holicity Inc.) ("Astra Space" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties and violations of federal law. Plaintiffs' allegations are based upon their personal knowledge as to themselves and their own acts, and upon information and belief, developed from the investigation and analysis by Plaintiffs' counsel, including a review of publicly available information, including filings by Astra Space with the U.S.

Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Company's directors and officers in their management and control of the Company.

## JURISDICTION AND VENUE

2.     Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Section 10(b) of the Exchange Act (15. U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)).

3.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

4.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

5.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

6.     Venue is proper in this Court because the Company is incorporated in Delaware.

## PARTIES

**Plaintiffs**

7.     Plaintiffs purchased shares of Astra stock during the time period in issue and continue to hold their Astra stock currently.

**Nominal Defendant**

8.      Nominal Defendant Astra is incorporated in Delaware with its headquarters at 1900 Skyhawk Street, Alameda, California.

**Director Defendants**

9.      *Defendant Chris C. Kemp* ("Kemp") is, and was at all pertinent times, the founder, Chief Executive Officer ("CEO"), and Chairman of the Company.  Since the merger (discussed below), Defendant Kemp has served in the same capacities for the Company. Defendant Kemp has 38.17% of the voting power of Company stock.  Percentage of total voting power represents voting power with respect to all shares of Class A common stock and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share.

10.      *Defendant Adam London* ("London") is the co-founder, Chief Technology Officer and a director of the Company.  Defendant London helped to found the Company in October 2016 and has served as the Chief Technology Officer and director since then. Defendant London leads the Company's technology strategy and long-term product roadmap. Defendant London co-founded and served as a managing partner for Ventions, LLC, which was the predecessor company, from January 2005 until September 2016.  Defendant London has 38.17% of the voting power of Company stock.  Percentage of total voting power represents voting power with respect to all shares of Class A common stock and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share.

11.      *Defendant Craig O. McCaw* ("McCaw") is a director of the Company. Defendant McCaw has 1.03% of the voting power of Company stock.  Percentage of total voting

power represents voting power with respect to all shares of Class A common stock and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share.

12.     **Defendant Scott Stanford** ("Stanford") is a director of the Company.  Defendant Stanford is a member of the Audit Committee and also a member of the Compensation Committee.  Defendant Stanford has 3.88% of the voting power of Company stock.  Percentage of total voting power represents voting power with respect to all shares of Class A common stock and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share. Further, funds managed by ACME, LLC and affiliates ("ACME") own 3.88% of the voting power of Company stock.  Defendant Stanford exercises voting and dispositive control over the securities held by ACME and thus may be deemed to beneficially own such securities.

13.     **Defendant Michael Lehman** ("Lehman") is a director of the Company. Defendant Lehman is the Chair of the Audit Committee and also a member of the Compensation Committee.

14.     **Defendant Michèle Flournoy** ("Flournoy") is a director of the Company.

15.     **Defendant Lisa Nelson** ("Nelson") Defendant Nelson is also a member of the Audit Committee.

16.     Defendants Kemp, London, McCaw, Stanford, Lehman, Flournoy and Nelson are collectively referred to herein as the "Director Defendants".

**<u>Officer Defendants</u>**

17.     **Defendant Kelyn Brannon** ("Brannon") is, and was at all pertinent times, the Chief Financial Officer ("CFO") of the Company.  Since the merger, Defendant Brannon has

4

served in the same capacity for the Company.

18.     ***Defendant Steven Ednie*** ("Ednie") was the Company's CFO and secretary prior to the merger.

19.     The Director Defendants and Defendants Brannon and Ednie are collectively referred to herein as the "Individual Defendants".

## BACKGROUND

### The Merger

20.     The Company was originally named Holicity Inc. ("Holicity"), and was established as a special purpose acquisition company, which completed its initial public offering in August 2020.  Holicity was incorporated for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses, and, prior to the Business Combination, the Company was a "shell company" as defined under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), because it had no operations and nominal assets consisting almost entirely of cash.

21.     On June 30, 2021, the Company consummated its previously announced business combination pursuant to the terms of the Business Combination Agreement, dated February 2, 2021, including the merger of Holicity Merger Sub Inc., a Delaware corporation and wholly-owned subsidiary of the Company ("Merger Sub") with and into Astra Space, with Astra Space continuing as the surviving corporation and as a wholly-owned subsidiary of Holicity (the "Business Combination").  Effective as of immediately prior to the effective time of the Business Combination, Defendants Kemp, London, McCaw, Stanford and Lehman were appointed to serve as directors of the Company.

22.     In connection with the closing of the Business Combination on June 30, 2021 (the

"Closing"), the surviving company and wholly owned subsidiary of Holicity, Astra Space changed its name to "Astra Space Operations, Inc." and Holicity changed its name to "Astra Space, Inc."

## FALSE AND MISLEADING STATEMENTS

23. On February 2, 2021, Defendants caused the Company to file with the SEC a Form 8-K (the "February 2, 2021 Form 8-K") signed by Defendant Ednie which attached a press release dated February 2, 2021 entitled *Astra to become the first publicly traded space launch company on NASDAQ via merger with Holicity*, which announced the merger between Astra (the "Merger Announcement Press Release").  The Merger Announcement Press Release stated: "'This transaction takes us a step closer to our mission of improving life on Earth from space ***by fully funding our plan to provide daily access to low Earth orbit from anywhere on the planet***,' said Chris Kemp, Founder, Chairman and CEO of Astra." (Emphasis added.)

24. The February 2, 2021 Form 8-K also attached an investor presentation (the "Investor Presentation"), which included the following slides touting the Company's ability to "Launch anywhere in the world in 24 hours", its timeline, and its potential market:











25.     On June 7, 2021, Defendants caused the Company to issue a press release entitled

*Astra Acquires Apollo Fusion to Reach New Orbits*, which stated the following regarding the

Apollo acquisition and its effects on the Company:

> Astra, the fastest privately funded company in history to reach space, announced today its planned acquisition of Apollo Fusion in a transaction valued up to $145 million. ***Apollo Fusion manufactures a leading electric propulsion engine. This acquisition allows Astra to provide launch and space services beyond low Earth orbit (LEO), to medium Earth orbit, geosynchronous, and lunar orbits***.
>
> ***"In addition to increasing Astra's total addressable market for launch services, the acquisition of Apollo Fusion accelerates Astra's ability to efficiently deliver and operate spacecraft beyond low Earth orbit," said Astra Founder, Chairman, and CEO Chris Kemp.***
>
> * * *
>
> "Propulsion systems open new destinations," said Apollo Fusion Founder and CEO Mike Cassidy. "Our team is excited to combine the flexibility of in-space propulsion with the world's most responsive launch provider."  [Emphasis added].

26.     On October 22, 2021, Defendants caused the Company to file with the SEC an

amended quarterly report for the period ended June 30, 2021 (the "Amendment") signed by

Defendants Kemp and Brannon.  Attached to the Amendment were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Kemp and Brannon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

27.     The Amendment stated the following regarding the Company's ability to launch "anywhere", its addressable market, and its diversification and broadband constellation plan:

> Our system consists of a small launch vehicle and mobile ground infrastructure that can fit inside standard shipping containers for rapid deployment anywhere in the world.  Our rocket requires a launch site with little more than a concrete pad and only six Astra employees on-site, leveraging our highly automated launch operations, and our production system is designed to scale efficiently to hundreds of launches per year. Our rocket's payload capacity is tailored for the needs of modern LEO satellite constellations, allowing precise and rapid placement of individual satellites into their required orbits. We believe this makes Astra's system more responsive and affordable than other launch alternatives, for thousands of LEO satellites planned in the coming decade.

28.     On November 11, 2021, during the Company's third quarter earnings call, when asked about a relationship with Firefly Aerospace Inc., Defendant Kemp stated the following:

> So then finally, the question on the supplier. I think there were some articles online speculating a supplier.  And I think I've discussed before, we don't discuss how we manufacture things or our suppliers publicly.  But what I can tell you, and I will reiterate here, is that all intellectual property required to produce all of our technology will be owned, licensed or developed by Astra.  And anything you've read is not inconsistent with this strategy.  So I think that's all I can say about that at this point.

29.     On November 15, 2021, Defendants caused the Company to file with the SEC its quarterly report for the period ended September 30, 2021 (the "3Q21 Report") signed by Defendants Kemp and Brannon.  Attached to the 3Q21 Report were certifications pursuant to SOX signed by Defendants Kemp and Brannon attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

30.     The 3Q21 Report stated the following regarding the Company's ability to launch "anywhere", its addressable market, and its diversification and broadband constellation plan:

> ***Our system consists of a small launch vehicle and mobile ground infrastructure that can fit inside standard shipping containers for rapid deployment anywhere in the world.  Our rocket requires a launch site with little more than a concrete pad and only six Astra employees on-site, leveraging our highly automated launch operations, and our production system is designed to scale efficiently to hundreds of launches per year.***  Our rocket's payload capacity is tailored for the needs of modern LEO satellite constellations, allowing precise and rapid placement of individual satellites into their required orbits. We believe this makes Astra's system more responsive and affordable than other launch alternatives, for thousands of LEO satellites planned in the coming decade.
>
> […]  ***On November 4, 2021, we announced the filing of an application with the Federal Communications Commission for V-band spectrum access, which, if approved, would allow us to offer a satellite constellation in the future.***
>
> \* \* \*
>
> On November 4, 2021, we filed an application with the Federal Communication Commission, under which we requested authority to launch and operate a nongeostationary orbit satellite system using ***V-band frequencies (the "Constellation") as we work to build out our Space Services offering to enable communications***.
>
> \* \* \*
>
> **Lowering Manufacturing Costs and Increasing Payloads** …
>
> We plan to increase the maximum payload capability of our rockets from approximately 50 kg for our first commercial flight to up to 500 kg for a mid-inclination 500 km orbit, which we believe will make Astra a compelling option for low Earth orbit constellation deployment and replenishment.  Our affordable manufacturing processes use normally readily available materials and are highly scalable, while we believe our ongoing improvements in design and manufacturing will further reduce our per rocket manufacturing costs.
>
> \* \* \*
>
> **Acquisition of Apollo Fusion**
>
> On July 1, 2021, the Company completed its acquisition of Apollo Fusion, Inc. ("Apollo"), a designer and builder of thruster propulsion systems for satellite programs.  [Emphasis added].

11

31.     The statements referenced in ¶¶ 23-30 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company cannot launch "anywhere"; (2) the Company significantly overstated its addressable market; (3) the Company overstated the effectiveness of its designs and reliability; (4) the Company significantly overstated its plans for diversification and its broadband constellation plan; and (5) as a result, these public statements were materially false and/or misleading at all relevant times.

## THE TRUTH EMERGES

32.     On December 29, 2021, market researcher Kerrisdale Capital released a report entitled *Astra Space, Inc (ASTR): Headed for Dis-Astra* (the "Report"), which alleged many issues with the Company.

33.     The Report stated the following regarding the Company's claims that it can launch anywhere:

> ***Management habitually describes Astra as having the flexibility to launch from "anywhere in the world," which is simply not true.*** Just because a rocket can be transported in a shipping container – doesn't mean one can lift off from any Walmart parking lot. ***In the US, Astra can only launch from an FAA-licensed commercial spaceport approved for vertical launch. There are only 5 such sites (plus SpaceX's private Boca Chica spaceport) located in the U.S.*** 97% of launches over the last 40 years have been from only 2 launch sites: Cape Canaveral spaceport (30 launches in 2020) and Vandenberg Space Force Base (1 launch in 2020). ***For a company aiming to launch hundreds of rockets per year, the reliance on a small handful of key spaceports is a bottleneck that threatens its whole business model.*** While there are ongoing modernization efforts at Cape Canaveral and the FAA is streamlining launch licensing requirements, these efforts can get bogged down in bureaucratic quagmires.
>
> ***Due to the fact vertical launch vehicles drop one or more stages downrange,***

*creating a hazard to life and property in the drop zones, vertical launches must take place near bodies of water (like Cape Canaveral) or in remote locations (Spaceport America, adjacent to White Sands Missile range in New Mexico).*

\* \* \*

Perhaps in recognition of the challenge in finding sufficient domestic spaceport access, the company has described working hard to secure launch sites internationally. International space agencies, trade groups, and regulatory bodies are working on various fronts to improve spaceport availability, but these efforts generally lag that of the US and have encountered their own challenges from local politicians and environmentalists. *How and if a US company with a US rocket would be granted approval – when many countries typically assign preference to supporting their own member nation launch programs – is also uncertain*. With so much focus on scaling manufacturing processes and launch cadence, the seemingly mundane issue of finding somewhere to launch is a risk to Astra's long-term vision because contrary to management's oft repeated claim – *Astra can't launch from anywhere.* [Emphasis added].

34.     The Report states the following regarding the Company's addressable market:

Astra's investor pitch boils down to selling the pipedream of an unprecedented number of cheap rocket launches. *Astra's forecast calls for 300 launches per year by 2025, a whopping 10x more than SpaceX achieved in 2021. Management markets this exceptionally aspirational goal (which we view as pure fantasy) in a bid to spread its expensive Bay Area manufacturing costs over enough rockets in order to turn a profit.* A reality check is in order: To date, Astra has managed just one successful orbital test flight. *If Astra's five-year projection of almost daily successful launches of rockets made with non aerospace grade parts does not sound improbable enough, it ignores an even graver problem with Astra's projection – not one expert whom we interviewed, nor any independent market study we reviewed, offered any reason to think that, industry-wide, sufficient market demand will exist for Astra to sustain approximately daily launches by 2035, let alone 2025.*

\*     \*     \*

**Financial Projections Rely on Absurd Market Assumptions**

Astra's financial forecasts rely on launching an astounding 165 rockets by 2024 and 300 rockets by 2025. *To put these figures in context, 300 launches is 10x the total number of US commercial launches in 2022.  300 is nearly triple the total number of launches conducted globally in 2020.* Incredibly, despite the obvious engineering, manufacturing, logistical, and regulatory challenges hitting such a cadence would represent, Astra felt it appropriate to issue this outlook before successfully reaching orbit even once.

13

**Planned Daily Launch Cadence Far Exceeds Addressable Market**

[…]  Astra touted big picture themes like "$1 trillion+ Total Space Economy in 2040" (from Morgan Stanley), and a misleading slide that shows a large increase in the cumulative number of satellites to be launched in the coming years, but without specifying Astra's niche role in this economy and the true addressability for a rocket with only a 500kg payload capability (eventually). It's a significant red flag with a simple explanation: every legitimate market study that Astra could include would only show its projections to be laughably unrealistic – so Astra just left them out.

\* \* \*

Below we walk through an analysis to determine a more refined view of the market opportunity for Astra as it strives to establish daily launch in 2025. We begin with NSR's estimate of the total number of non-GEO satellites to be launched in 2025 (2,255). We then apply two simple filters: 1) we exclude 90% or 851 of NSR's North American communications satellites forecast to account for Starlink (SpaceX launched 850 Starlink satellites in 2020), 2) we deduct 90% of satellites from Asia and 20% from Europe based on the contribution to these regions from Chinese and Russian satellites.

## Astra 2025E Launch TAM

|                                   | 2025E  |
|-----------------------------------|--------|
| Total Non-GEO Satellite Launches  | 2,255  |
| Less: NA Communications           | (851)  |
| Less: 90% Asia (China)            | (792)  |
| Less: 20% of Europe (Russia)      | (25)   |
| Total Addressable Non-GEO Satellites | 587 |

*Source:  Kerrisdale analysis and Northern Sky Research, Global Satellite Manufacturing and Launch Markets 11th Edition, July 2021.*

At less than 600 satellites, the entire non-captive TAM for launch is easily supported by less than 100 total launches. SpaceX rideshare recently set a record for 134 satellites on a single mission. ***Juxtapose a potential addressable market of less than 100 launches in aggregate, with Astra's projection of conducting***

14

*300 launches themselves when there are dozens of competitors, and one can see why our conversations with a range of industry participants yielded the following comments regarding Astra's plans*:

"*I laugh at that number . . . .  There's no way they are doing 300 launches by 2025; by 2035 it would still be a stretch*."

— Senior Engineer, launch broker

"We are, all around in the industry, in the same spot. *Even within Astra and at [our small launch company], I'm looking at [1/10th Astra's number] rockets, and we are freaking out – are we really going to have enough customers for this?*"

— Senior Engineer, small launch provider

"Happy they got to orbit on last launch a few weeks ago, that's great, but *there's just a lot of issues with their rocket and their business model*…claims of launching every day? It's pretty exciting when a launch provider can launch once a month – and sure, *everyone would love for rockets to be like airplanes – that's not going to happen for at least another decade*. So yes, I have some serious concerns about Astra's claims."

— Mission Manager for a broadband mega-constellation

… We believe there will always be some level of interest in a service that can regularly/flexibly bring a handful of smallsats to a specific orbital location, even at a premium price to rideshares – but that is a niche offering in a highly competitive field. *It is not an addressable market that comes anywhere near supporting 300 launches per year for a single company with Astra's limited capabilities*.

\*     \*     \*

This is because *while satellite volumes are increasing, launch pricing is under constant deflationary pressure (the latter is enabling the former).*

*Competition from new entrants and from larger rideshare players lowering price, cost efficiencies from reusable launchers, and improvements in technology and operations all conspire to exert downward pressure on price.* Taken together, we estimate a total launch market value that averages ~$13bn per year over the next several years, with a whopping 85% accounted for in constellations, where larger launch vehicles enjoy economies of scale, leaving an annual TAM for a small launcher like Astra in the $~2 billion dollar range. Astra's 2025E launch revenue forecast of $1.125bn assumes it can hold ASP constant at $3.75m and rise in 4 years to become the dominant player in the small

launch market. Either NSR is too pessimistic (which anyone who has followed the industry knows is not usually how industry projections work) or, as we would contend, the projections of a new space SPAC, announced at the height of the bubble (two days before Virgin Galactic hit its all-time high of $62) is complete fantasy.

***Without High Launch Cadence, Astra's Business Model Falls Apart***

***[…]  The problem lies in the unit economics of launch.  […]***

\* \* \*

***Investors should be asking whether Astra devised a launch cadence to meet market demand or to merely solve for the inherent weaknesses in its business model?*** Our research, supported by a range of interviews with key industry players, point strongly to the latter. ***Astra took full advantage of the lack of scrutiny SPACs enjoyed earlier this year relative to traditional IPOs, passed off a launch cadence without any supporting market demand, and sold equity in a bubble that has now burst.*** As a launch services broker with direct insight into market trends on a global basis described, "we get it, it was a cash grab…but how are you not going to squander all this money? Astra is all show and it's not clear where they're going to go aside from just building a bunch of stuff."  [Emphasis added].

35.    The Report stated the following regarding the Company's designs:

Its main competitors will soon be launching larger 1,000kg+ payload rockets while Astra has yet to overcome developmental hurdles necessary to successfully launch even a single satellite into any of the emerging broadband mega constellations. Shortly after Astra announced its SPAC merger, the company increased its payload capacity goal (not a trivial matter in rocket programs) and signed a "secret" deal with a competitor for access to some of the competitor's more powerful engine IP – both clear signs that Astra is struggling to keep pace with market leaders. Moreover, Astra shortsightedly relies on cheap, off-the-shelf commercial parts – a strategy that precludes it from exploiting the economic advantages that its more sophisticated competitors enjoy by developing reusable rockets that in the long run reduce expenses. Consequently, Astra remains strikingly vulnerable to the relentless price deflation that characterizes today's launch market.

\*     \*     \*

**Undersized and Not Reusable: Astra is Falling Behind Industry Trends**

\*     \*     \*

16

Not only is the overall addressable market Astra has promoted vastly overstated – Astra's development path is on the wrong side of key trends within the industry: larger payloads and reusability.

Most of the increase in mass-to-orbit in the coming decade will be as part of large broad band constellations. According to NSR, nearly 80% of all non-GEO satellites from now until the end of the decade will be part of constellations of communications smallsats. Smallsat manufacturers are taking advantage of declining launch costs to build larger, more sophisticated constellations of satellites which generally have more mass than previous iterations.

*   *   *

Now examine Astra's development path and some of the changes it has announced only months into being a public company. At the time of the SPAC announcement 10 months ago, Astra's stated goal was a 300kg payload to 500km Sun-Synchronous Orbit by 2023. By 2025, it hoped a vehicle that can "throw about 300 kilograms to a reference orbit" would be launched daily. Only 3 months later however, in conjunction with the Planet launch agreement, Astra announced a new goal: 500kg to 500km LEO. Why the sudden change? Because according to experts in the industry, management likely knew that to make good on claims that Astra could "meet the needs of all these mega-constellations like Kuiper", it needed a rocket with more than just a 300kg payload.

***Announcing a 66% jump in payload capacity is not a trivial matter in rocket development.*** It involves meaningful redesign work with new components and a more powerful engine – one that apparently Astra did not have. As a sign of Astra's unpreparedness, four months after the new 500kg objective, ***Astra signed a "secret" deal to purchase the IP for an engine powerful enough to launch this new 500kg payload from its competitor, Firefly Aerospace (more on this later).***

Even with this shortcut, Astra will still only have a rocket two years from now that is able to launch 1 Project Kuiper satellite, barely 2 Project Pelican satellites from Planet, and zero Gen2 Starlink satellites.

*   *   *

In addition to higher payloads, rockets that are partially or fully reusable continue to lower the cost profile of the launch industry. In the conference call announcing Astra's SPAC merger, management claimed the unit economics of mass manufacturing small rockets could match that of a large rocket. Below we walk through how that falls apart once one factors in the marginal cost of SpaceX's reusable Falcon 9 and planned Starship.

## Marginal Cost Benefit of Reusable Rockets

| | ★ ASTRA | Reusable | Marginal Cost | |
| | Rocket 5 | Falcon 9 | Falcon 9 | Starship |
|---|---|---|---|---|
| BOM + Labor Cost ($ M) | $1 | $28 | $15 | $2 |
| Payload to LEO (kg) | 500 | 13,680 | 13,680 | 100,000 |
| $/kg Production Cost | $2,000 | $2,047 | $1,096 | $20 |
| Timeframe | 2025 | Now | Now | 2022/23 |

*Source: Astra investor presentations, public comments from Elon Musk, Kerrisdale Analysis.*

[…] After the maiden voyage however, Musk has stated the marginal cost of refurbishing and launching a reusable Falcon 9 drops to only $15m. Applied against a 13,680kg payload, (a reduction of 40%) to account for the reusability of the booster and fairing, and now the incremental cost of production is nearly half that of Astra's target for 2025. The cost advantage for a re-used Starship is even more dramatic. Musk has outlined the possibility Starship may fly for a marginal cost of just $2m, a staggering $20/kg, orders of magnitude cheaper than anything Astra can hope to achieve (even if one discounts Musk's hyperbolic tendencies).

Other small launchers in the industry are following SpaceX's path to capture these economics. Rocket Lab's Electron is being evolved to become partially reusable using parachutes and mid-air recapture, while its Neutron rocket will be partially reusable thanks to propulsive landing. Relativity Space aims to start flying a fully re-usable, 3D-printed Terran R rocket in 2024. VC start-ups like STOKE are developing reusable rockets. Astra on the other hand, a company with a corporate slogan of "Improve life on Earth from Space," and a CEO with a "vision of a healthier" planet has no path to developing a reusable rocket, and apparently does not see a problem with having hundreds of rockets land in the ocean every year.

*     *     *

**"Secret" Firefly Engine Deal is Sign of Weakness**

On September 21, the tech blog TheVerge.com, reported that Astra agreed to acquire the right to manufacture rocket engines in-house from launch competitor,

18

Firefly Aerospace, for roughly $30m. The article references internal Firefly documents viewed by the publication and includes specifics which suggest the agreement was leaked by Firefly. Though Astra's CEO and VP of Communications declined to comment on certain specifics of the agreement, neither disputed its existence (there is no mention of this material agreement in Astra's SEC filings and no press releases were ever issued by either company). When asked on the last quarterly call about the reported Firefly relationship, management once again did not disclaim the existence of the agreement, stating that anything the analyst had read online was "not inconsistent" with a strategy of all technology being "owned, licensed, or developed by Astra.

***So why the cloak and dagger?  Perhaps Astra is aware that buying the IP for the most critical piece of hardware on a rocket from a direct competitor is not exactly a good look***. …

Unsurprisingly, when doing a deal with a competitor, the agreement has some important restrictions. ***The IP agreement allegedly includes a clause that only allows Astra to use two Reaver engines per rocket – enough to hit Astra's goal of 500kg to 500km – but no more. Recall that Firefly is developing a 630kg-1,000kg rocket, and therefore the agreement caps Astra's use of the IP just below Firefly's capability and the emerging sweet spot for smaller launchers. Firefly seems content to help Astra for a price – but it isn't foolish enough to solve a direct competitor's problem of being undersized***.  [Emphasis added].

36.     The Report stated the following regarding the Company's reliability and quality

issues:

**Ignoring Reliability Issues is a Risky Game**

Conversations with an individual familiar with Astra's rocket design and manufacturing suggest investors may have to endure an uncomfortably high rate of failure as the company ramps to a targeted monthly launch cadence in 2022. Astra has previously stated "we're actually not shooting for 100 percent reliability" and is willing to trade a small amount of reliability for cost savings. Note that, ***despite "accepting less than 100%" reliability, Astra's financial projections as presented during the SPAC process assume zero failures (naturally).***

CEO Chris Kemp has said an 80% success rate is a level Astra internally deems acceptable, substantially lower than the high 90s of far more sophisticated launch programs.  ***This rate is an aspirational goal as the company continues to test and refine manufacturing, not the company's current level of anticipated quality. At the current stage of Astra's development, our source believes the risk of failure is as high as 1 in 2 launches.***

The stakes are now substantially higher. ***Astra is trying to develop reliability of a cheap rocket, built without any redundancies, under the scrutiny of public markets to which it needs continued access***. [Emphasis added].

37.     The Report stated the following regarding the Company's plans for diversification

and its broadband constellation plan:

**Space Services Strategy Lacks Clarity and Credibility**

In June, Astra announced the acquisition of Apollo Fusion, a manufacturer of electric propulsion engines for small satellites, in a transaction valued up to $145m ($30m in stock, $20m in cash, and an additional $95m in potential earnouts).

The acquisition is part of a broader trend within the industry to move beyond just launch services to higher margin, in-space sources of revenue. As Firefly CEO Tom Markusic explained, "the rocket gives you the keys to space. It's critically important, but the big revenue is doing things in space." The need for this diversification is driven by the fact that while launching rockets to the heavens can be an awe-inspiring event – as an actual business there's not a lot to be excited about. ***At its core, building and launching rockets is a risky, capital intensive, non-recurring, low-margin hardware business. Greater profits (and valuations) lie in moving up the value chain to develop turnkey "space solutions", orbital transport vehicles, and operating constellations.***

\*     \*     \*

The problem with a small launcher that wants to provide greater service in space is everyone has the same idea. Making orbit transfer vehicles (OTVs) that facilitate "last mile" delivery of a satellite to a specific orbit or moving beyond LEO to MEO [medium Earth orbit], GEO [geosynchronous orbit] and lunar orbits is a crowded field. Our research yielded no fewer than 10 domestic launch providers, component suppliers, rideshare aggregators, and smallsat propulsion manufacturers that have OTVs in development with launch dates over the next 3 years, and another 8 internationally.  The prospects for developing a successful broadband constellation is even more challenging. ***Astra's crazily ambitious Vband constellation is years behind Starlink, OneWeb, and Project Kuipe without any of the technical and financial resources, and without a business case that justifies the bootstrapping of yet another broadband megaconstellation***.  Taken together, Astra's acquisition of Apollo Fusion and V-band spectrum application are uninspired attempts at mimicking the strategies of more advanced competitors which underscore the limitations of its undersized rocket in providing in-space solutions.

***An engineer we spoke with who is familiar with Apollo Fusion's history stated***

*the company originally generated excitement within the propulsion community for a system using iodine as a propellant.* The technology didn't work as hoped and within a couple years Apollo transitioned to using Mercury, a low pressure propellant used in thrusters since the 1960's. Just like iodine, Mercury is toxic, and after the idea of working with a dangerous neurotoxin before showering into the atmosphere was (thankfully) reconsidered, it too was discontinued in favor of Apollo's current propulsion system based on Xenon and Krypton – propellants that nearly everyone in the propulsion industry has been using for decades. *As the expert explained, "[Apollo Fusion] is a company that has made claim 1 and failed, made claim 2 and failed, and is now building something that everyone else has been building forever."* Without any proven technological differentiation, the only way to win business is price, a market position which puts a dent in the strategy of "moving up the value chain."

*Astra's acquisition of Apollo Fusion is an example of a company making decisions based on what it must do given the limitations of its rocket – not what the market wants, and not what a company without such limitations would ever devise.* The right solution for an OTV would have been chemical propulsion but Astra couldn't go that route because of the bulkier dimensions of the system's propellant tanks. Under pressure to keep up with competitors, electric propulsion was simply the only option small and light enough to fit in Astra's rocket. *While others in the industry like Rocket Lab are developing well-suited, best-in-class technology, enabling a variety of TAM-expanding missions, Astra is settling for suboptimal acquired technology with only niche applications.*

**Broadband Constellation Plan is a Pipedream**

\*       \*       \*

A few months after acquiring Apollo Fusion, Astra filed an application with the FCC to use V-band spectrum for a constellation of up to 13,620 satellites. V-band is high frequency spectrum that sits above Ka-band, from 40GHz-75GHz, and I sensitive to rain fade and physical interference. *No ecosystem currently exists to support the use of V-band for space-based telecommunications*. As described by satellite communications expert, Chris Quilty of Quilty Analytics, "It's expensive, it's early stage, and there are limited sources of supply. I would argue that companies that are trying to build these components on their own are going to run into significant engineering challenges."

*It's worth pausing to note the absurdity of the FCC filing: Astra has never built a single satellite; it has not yet proven it can reliably execute on its core business of launching small rockets – and yet, it filed an application for a constellation 2x larger than the next largest proposal from Amazon.* While the application technically amounts to little more than a procedural "land grab" for spectrum rights, investors should be concerned about how and why a launch company still working out the kinks of rocket development would even

contemplate the endeavor.  Unsurprisingly, Kemp seems to want to avoid talking about the entire project.

\*     \*     \*

***And where would the money for any of this come from? Astra only has enough cash on hand to get through 2023 (maybe). Satellite manufacturing, terminal development, gateways, regulatory approval, landing rights . . . the list goes on and the costs are staggering.***  Musk has pegged Starlink total investment costs at between $20 and $30 billion, OneWeb went bankrupt, and Project Kuiper and Telesat are years behind schedule.  ***We believe Kemp does not wish to discuss Apollo Fusion technology being used for an internal satellite bus or the development of an Astra constellation, because the enormity of the costs and equity dilution involved would send investors running for the hills.***

***Attempts to "expand TAM" through M&A and develop higher margin service revenue are a distraction when Astra hasn't even executed on its supposed core competency: launching rockets***.  [Emphasis added].

38.    On this news, the Company's shares fell $1.10 per share, or approximately 14%, to close at $6.61 per share on December 29, 2021.

## DUTIES OF THE DIRECTOR DEFENDANTS

39.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith.  The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner.  The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

40.    Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets.  In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information regarding the Company's operations, finances, and

financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

41.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company.  By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)        ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)        ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

42.    Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.

43.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

44.    The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the business results and prospects of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## THE AUDIT COMMITTEE CHARTER

45.    The primary purpose of the Audit Committee is to discharge the responsibilities of the Board with respect to the Company's accounting, financial, and other reporting and internal control practices and to oversee our independent registered accounting firm. The Audit Committee's specific responsibilities include: (i) selecting a qualified firm to serve as the

independent registered public accounting firm to audit our financial statements; (ii) helping to ensure the independence and performance of the independent registered public accounting firm; (iii) discussing the scope and results of the audit with the independent registered public accounting firm, and reviewing, with management and the independent accountants, our interim and year-end operating results; (iv) developing procedures for employees to submit concerns anonymously about questionable accounting or audit matters; (v) reviewing policies on risk assessment and risk management; (vi) reviewing related party transactions; (vii) obtaining and reviewing a report by the independent registered public accounting firm at least annually, that describes our internal quality-control procedures, any material issues with such procedures, and any steps taken to deal with such issues when required by applicable law; and (viii) approving (or, as permitted, pre-approving) all audit and all permissible non-audit service to be performed by the independent registered public accounting firm.

46.     The Audit Committee Charter (the "Charter") defines the duties and responsibilities of the Audit Committee:

5.     Duties and Proceedings of the Committee. The Committee shall assist the Board in fulfilling its oversight responsibilities by performing the following duties:

5.1.   Oversight of the Independent Auditor.

(a)   Annually evaluate, determine the selection of and, if necessary, determine the replacement or rotation of the independent auditor, the lead audit partner and any other active audit engagement team.

(b)   Approve or pre-approve all auditing services (including comfort letters and statutory audits) and all permitted non-audit services by the independent auditor and pre-approve the related fees. By this Charter, the Committee hereby delegates to each of its members, acting singly, the authority to pre-approve any audit services if the need for consideration of a pre-approval request arises between regularly scheduled meetings. Any such approvals shall be

presented to the Committee at its next scheduled meeting or as soon as practicable thereafter.

(c)   Ensure the receipt of, review, evaluate and discuss formal written reports, at least annually, from the independent auditor regarding the auditor's independence, including a delineation of all relationships between the auditor an the Company; engage in a dialogue with the independent auditor with respect to any disclosed relationships or services that may impact its objectivity and independence; and take, or recommend that the Board take, appropriate action to oversee the independence of the independent auditor.

(d)   Establish hiring policies for employees or former employees of the independent auditors.

(e)   At least annually, (i) obtain and review a report, orally or in writing, from the independent auditor describing the firm's internal quality-control procedures and any material issues raised by the most recent internal quality-control review, or peer review, of the firm, or by any inquiry or investigation by governmental or professional authorities, within the preceding five years, with respect to one or more independent audits carried out by the firm, and any steps taken to deal with any such issues, and (ii) assess the auditor's independence and all relationships between the independent auditor and the Company.

(f)   Obtain from the independent auditors assurance that, to the extent applicable, Section 10A(b) of the Exchange Act (as set forth on Appendix I hereto), has not been implicated.

5.2.   Oversight of Audit Process and Company's Legal Compliance Program.

(a)   Review with the independent auditor the overall scope and plans for audits, including authority and organizational reporting lines and adequacy of staffing and compensation. Review with the independent auditor any noteworthy audit problems or difficulties, including any restrictions on the scope of the independent auditor's activities or on access to requested information and any significant disagreements with management, and management's response to such problems or difficulties.

(b)   Review and discuss with management and the independent auditor the Company's system of internal controls, its financial and critical accounting practices and its policies relating to risk assessment and management.

(c)     Review disclosures about any significant deficiencies or material weaknesses in the design or operation of the Company's system of internal controls and any fraud involving management or employees playing a significant role in the Company' system of internal controls, including, to the extent applicable, any disclosures made by the Company's principal executive officer and principal financial officer during their certification process for the Annual Report on Form 10-K and Quarterly Reports on Form 10-Q.

(d)     Review any special steps or remedial measures adopted in light of material control weaknesses or significant deficiencies, if any.

(e)     Review, to the extent applicable, the Company's internal controls report and the independent auditors' internal controls report prior to the filing of any reports, including without limitation, any Annual Report on Form 10-K required to be filed by the Company with the SEC.

(f)     Review with management the Company's procedures and practices designed to provide reasonable assurance that: (i) the Company's books, records, accounts and internal accounting controls are established and maintained in compliance with all applicable federal and state laws, regulations and requirements to which the Company is subject, and (ii) there are adequate company-level controls in place to prevent or detect (A) any improper or illegal disbursement of corporate funds or property of value or (B) the making of any arrangement on behalf of the Company which may provide for or result in the improper or illegal disbursement of funds or property of value, in order that the Company be in compliance with such laws and regulations.

(g)     Receive and review reports of the independent auditor discussing (i) all critical accounting policies and practices used in the preparation of the Company's financial statements, (ii) all alternative treatments of financial information within GAAP that have been discussed with management, the ramifications of the use of such alternatives and the treatment preferred by the independent auditor and (iii) other material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

(h)     Discuss with management and the independent auditor changes in the Company's critical accounting principles and the effects of alternative GAAP methods, off-balance sheet structures and regulatory and accounting initiatives.

(i)    Review and discuss with management and the independent auditor the annual and quarterly financial statements and management's discussion and analysis of financial condition and results of operation of the Company prior to the filing of the Company's Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q. Discuss results of the annual audit and quarterly reviews and any other matters required to be communicated to the committee by the independent auditor under generally accepted auditing standards, including Auditing Standard No. 1301 (as may be modified or supplemented). Discuss with management and the independent auditor their judgment about the quality of accounting principles, the reasonableness of significant judgments, including a description of any transactions as to which management obtained Statement on Auditing Standards No. 50 letters, and the clarity of disclosures in the financial statements, including the Company's disclosures of critical accounting policies and other disclosures in "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its Annual Reports on Form 10-K and Quarterly Reports on Form 10-Q. Discuss with the independent auditor critical audit matters ("CAM") and related CAM disclosures.

(j)    Review, or establish standards for the type of information and the type of presentation of such information to be included in, earnings press releases (paying particular attention to the use of "pro forma" or "non-GAAP financial measures") and guidance provided to analysts and rating agencies.

(k)    On a timely basis, discuss with management and the independent auditors any correspondence with regulators or governmental agencies and any published reports, if any, that raise material issues regarding, or call into question the integrity of, the Company's financial statements or accounting policies.

(l)    Review material pending legal proceedings involving the Company and other contingent liabilities and oversee the Company's activities with respect to such legal proceedings.

(m)    Establish procedures for the prompt internal reporting, including confidential reporting of violations of the Code of Business Conduct and Ethics and receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and the confidential, anonymous submissions by employees of concerns regarding questionable accounting or auditing

matters and any other violations of the Company's policies. Review any such complaints and submissions that have been received, including the current status and the resolution if one has been reached, and retain authority to determine the appropriate response and remedy.

(n)     Assist the Board in its oversight of risk, which includes without limitation overseeing the management of financial risks, such as with respect to accounting matters, liquidity and credit risks, corporate tax positions, insurance coverage, insider trading and cash investment strategy and results, and risks relating to the performance of the Company's internal audit function and its independent registered public accounting firm, as well as the Company's systems of internal controls and disclosure controls and procedures.

(o)     Oversee the integrity of the Company's information technology systems, processes and data, and shall review and assess with management on a quarterly basis, (i) the adequacy of controls and security for the Company's information technology systems, processes and data, and (ii) the Company's contingency plans in the event of a breakdown or security breach affecting the Company's information technology systems.

(p)     Review with management the Company's disclosure controls and procedures related to internally reporting and processing information about cyber security risks and incidents to ensure that such information is reported to the appropriate personnel to enable senior management to make timely and appropriate disclosure decisions with respect to such information.

(q)     Pursuant and in accordance with the Related Party Transactions Policy, review and approve any proposed transaction with a value between the Company and any related party or related person (other than transactions that are subject to review by the Board of Directors as a whole or another independent body of the Board of Directors), as defined by applicable law, the Nasdaq rules, or the rules of the Securities and Exchange Act of 1934, as amended.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

47.     Plaintiffs bring this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by Defendants.

48.     Plaintiffs will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

49.     During the illegal and wrongful course of conduct at the Company and to the present, the Board consisted of Defendants Kemp, London, McCaw, Stanford, Lehman, Flournoy and Nelson.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

50.     Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

51.     Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

52.     Each of the Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

53.     Each of the Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are

principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

54.     Additionally, each of the Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Kemp**

55.     Because of his CEO and Chairman of the Board with the Company, Defendant Kemp is not independent.

56.     Defendant Kemp was responsible for most of the false and misleading statements and omissions that were made, including those contained in the Company's SEC filings referenced herein, many of which he either personally made or signed off on.

57.     Defendant Kemp is not independent from Defendants Lehman and Stanford, because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO (Defendant Kemp).  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Kemp could not consider a demand adverse to the members of the Compensation Committee as they are responsible for his financial future.

58.     Defendant Kemp is also a Defendant in the securities class action entitled *Artery v. Astra Space, Inc., et al.*, Case No.: 1:22-cv-00737-DG-MMH (E.D.N.Y.) (the "Securities Class Action") and faces a substantial likelihood of liability; therefore, demand on Defendant Kemp is futile.

59.     Defendant Kemp has 38.17% of the voting power of Company stock.  Percentage of total voting power represents voting power with respect to all shares of Class A common stock

and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share. Because of his majority holding and control over the Company, Defendants McCaw, Stanford, Lehman, Flournoy and Nelson would not pursue claims against Defendant Kemp.

**Defendant London**

60.     Because of employment with the Company as Chief Technology Officer, Defendant London is not independent.

61.     Defendant London is not independent from Defendants Lehman and Stanford, because they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of Defendant London.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant London could not consider a demand adverse to the members of the Compensation Committee as they are responsible for his financial future.

62.     Defendant London has 38.17% of the voting power of Company stock. Percentage of total voting power represents voting power with respect to all shares of Class A common stock and Class B common stock, as a single class.  Each share of Class B common stock is entitled to 10 votes per share and each share of Class A common stock is entitled to one vote per share.  Because of his majority holding and control over the Company, Defendants McCaw, Stanford, Lehman, Flournoy and Nelson would not pursue claims against Defendant Kemp.

**Defendants Lehman, Nelson and Stanford**

63.     Defendants Lehman, Nelson and Stanford served as members of the Audit Committee during the Relevant Period.  Pursuant to the Audit Committee Charter, the Audit

Committee Defendants were responsible for, *inter alia*, the effectiveness of the Company's internal controls, the integrity of its financial statements, and aspects of risk management, including legal and regulatory compliance that may affect the Company's financial reporting. Defendants Lehman, Nelson and Stanford failed to ensure the integrity of the Company's internal controls, as they are charged to do under the Audit Committee Charter and to issue false and misleading financial statements with the SEC. Thus, Defendants Lehman, Nelson and Stanford breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## COUNT I

### (Against Defendants For Breach Of Fiduciary Duty)

64.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

65.     Defendants owed the Company fiduciary obligations.  By reason of their fiduciary relationships, Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

66.     Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

67.     Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties.  Among other things, Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other public disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described

above.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

68.     As a direct and proximate result of Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages.  As a result of the misconduct alleged herein, Defendants are liable to the Company.

69.     As a direct and proximate result of Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending and/or settling securities lawsuit and severe damage to the share price of the Company's stock, all resulting in an increased cost of capital, and reputational harm.


## COUNT II

### (Against Defendants For Waste Of Corporate Assets)

70.     Plaintiffs incorporate by reference and reallege each and every allegation contained above, as though fully set forth herein.

71.     The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

72.     As a result of the misconduct described above, Defendants wasted corporate assets by, *inter alia*: (a) paying excessive compensation, bonuses, and termination payments to certain of its executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs to defend and/or settle the Securities Class Action.

73.     As a result of the waste of corporate assets, Defendants are liable to the Company.

74.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT III

### (Against Defendants For Unjust Enrichment)

75.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

76.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, Defendants were unjustly enriched at the expense of, and the detriment of, the Company.

77.     Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance or artificially inflated valuation of the Company or received compensation or other payments that were unjust in light of Defendants' bad faith conduct.

78.     Plaintiffs, as shareholders and representatives of the Company, seek restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

79.     Plaintiffs, on behalf of the Company, have no adequate remedy at law.

## COUNT IV

### (Against Defendants Kemp, Brannon, and Ednie for Contribution Under Sections 10(b) and 21D of the Exchange Act)

80.     Plaintiffs incorporate by reference and reallege each and every allegation set forth above, as though fully set forth herein.

81.     The Company and Defendants Kemp, Brannon and Ednie are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 21D of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.  If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Kemp, Brannon, and Ednie willful and/or reckless violations of their obligations as officers and/or director of the Company.

82.     Defendants Kemp, Brannon and Ednie, because of their positions of control and authority, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

83.     Accordingly, Defendants Kemp, Brannon and Ednie are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

84.     As such, the Company is entitled to receive all appropriate contribution or indemnification from Defendants Kemp, Brannon and Ednie.

## **REQUEST FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment as follows:

A.     Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.     Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the

Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and risk management, and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.      Awarding to the Company restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.      Awarding to Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury on all issues so triable.

Dated: March 8, 2022

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
Email: rernst@bk-legal.com

**GAINEY McKENNA & EGLESTON**
Thomas J. McKenna
Gregory M. Egleston
501 Fifth Avenue, 19th Floor
New York, NY 10017
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiffs*